# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 16-832V
**Filed: January 31, 2020**
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * *
                                            *
BRENT OWENS,                                *
                                            *
            Petitioner,                     *   Findings of Fact; Onset;
                                            *   Bell's Palsy
      v.                                    *
                                            *
SECRETARY OF HEALTH                         *
AND HUMAN SERVICES,                         *
                                            *
            Respondent.                     *
                                            *
* * * * * * * * * * * * * * * * * * * * * * *
```

*Lauren Faga & Patrick Kelly*, Conway Homer, PC, Boston, MA, for Petitioner.
*Claudia Gangi*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ONSET[1]

**Oler**, Special Master:

On July 13, 2016, Brent Owens ("Mr. Owens" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). The petition alleges that the influenza ("flu")

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

vaccination Mr. Owens received on October 28, 2014 caused him to suffer from Bell's Palsy. Pet. at 1.

During the pendency of this matter, Petitioner submitted three affidavits that he authored, along with an affidavit prepared by his wife. The facts Petitioner presented in his affidavits relating to the onset of his medical symptoms differed from those documented in some of Petitioner's medical records. When discrepancies exist between medical records and affidavits, "Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing." *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006).

Accordingly, I held a hearing on October 3, 2019, by video teleconference ("VTC") in Washington, DC, to determine the date of onset of Petitioner's tongue numbness and facial droop. Ms. Lauren Faga and Mr. Patrick Kelly appeared on behalf of Petitioner and Ms. Claudia Gangi appeared on behalf of Respondent. I heard testimony via VTC from Petitioner and his wife, Amanda Owens.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and documentary evidence, I find that Petitioner's tongue numbness began on the morning of October 29, 2014 and that his facial droop began on the morning of October 30, 2014.

**I. Procedural History**

On July 13, 2016, Petitioner filed a petition alleging that he suffered from Bell's Palsy as a result of a flu vaccine administered on October 28, 2014. Petition, ECF No. 1. Petitioner filed medical records and his first affidavit on July 15, 2016. Exs. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12. Petitioner filed additional medical records on August 2, 2016. Ex. 14.

On November 10, 2016, Respondent filed a Rule 4(c) Report. ECF No. 13. Respondent states that Petitioner has not provided evidence that satisfies his burden of proof under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005), specifically noting that Petitioner provided inconsistent statements about the onset of his symptoms. Resp's Rept. at 6-7. Respondent further states that Petitioner has not shown a proximate temporal relationship between the vaccine and onset of symptoms. *Id.*

On June 13, 2017, Petitioner filed an expert report from Dr. Nizar Souayah. Ex. 15. On November 16, 2017, Respondent filed an expert report from Dr. Peter Donofrio. Ex. A.

Petitioner filed his second affidavit and an affidavit from his wife on May 3, 2018. Exs. 17, 18. He filed additional medical records on August 30, 2019. Exs. 19, 20.

I conducted a fact hearing on October 3, 2019 in Washington, DC. On October 4, 2019, I ordered Petitioner to file several additional documents. ECF No. 46. Pursuant to my order, Petitioner filed additional exhibits on December 18, 2019 (Exs. 21, 22, 23); December 19, 2019 (Ex. 53), December 27, 2019 (Ex. 24), January 16, 2020 (Ex. 25), and January 17, 2020 (Ex. 26).

2

Petitioner filed a status report on January 17, 2020 indicating that the record is now complete. ECF No. 61.  The matter is now ripe for adjudication.

**II. Petitioner's Medical Records that Relate to the Issue of Onset**

Petitioner was born in 1982.  He was 32 years old on Tuesday, October 28, 2014, when he received the allegedly causal flu vaccination at Walgreens Pharmacy in Wilmington, North Carolina.  Ex. 1 at 1-2.

On October 30, 2014 at 11:30am, Petitioner visited Dr. Feras Tanta.  During this visit, he reported numbness and pain on the right side of his face, along with headache, paresthesia, and tingling.  The record states, "Onset was 2 days ago and it was acute."  Ex. 2 at 1.  Dr. Tanta's impression was facial weakness, Bell's Palsy, and allergic reaction.  *Id.* at 2.  Dr. Tanta prescribed a high dose taper of steroids.  *Id.*

On October 30, 2014 at 6:50pm, Petitioner arrived at the New Hanover Regional Medical Center Emergency Department.  Ex. 6 at 69.  At 8:04pm, Nurse Casey Foster saw and evaluated Petitioner.  Her notes indicate as follows:

> Patient presents to ED with chief complaint of headache and facial drooping. Patient states that on Tuesday night he received a flu shot.  Patient woke up on Wednesday with his tongue numb.  Patient woke up this morning with a right facial droop, worsening tongue numbness.  Patient was seen by his PCP and was given steroids.

*Id.* at 74.

On October 31, 2014, Petitioner was admitted to the New Hanover Hospital.  He filled out a questionnaire on that date answering some basic information about his condition.  Ex. 6 at 105. The first two substantive questions and answers read as follows:

> **Q:** What is your present complaint or problem?
>
> **A:** Fasical weakness [sic] problems similar to Belle [sic] palsy or GBS
>
> **Q:** About how long ago did it start?
>
> **A:** 3 Days

*Id.*  A brain MRI with and without contrast was unremarkable.  *Id.* at 100.

On November 13, 2014, Petitioner visited the VA for treatment of Bell's Palsy.  Ex. 4 at 21.  This record indicates that Petitioner received his flu vaccination on October 28 from a non-VA hospital.  *Id.*  The record then states, "48 hours later noted onset of paralysis of right face and numbness in his tongue."  *Id.*

On November 17, 2014, Petitioner returned to see Dr. Tanta for a follow-up appointment. Ex. 2 at 4. Dr. Tanta referred him to Dr. Coin, a neurologist. *Id.* at 5. Petitioner visited Dr. Coin on January 16, 2015. Ex. 10 at 1. Dr. Coin noted that "on October 28th, [Petitioner] had the flu shot and almost exactly 48 hours later, he started having numbness of his tongue on the right and weakness of the face." *Id.*

On February 10, 2016, Petitioner visited Atlantic Vision Center for a comprehensive eye exam. Ex. 11 at 1. The notes from this record state,

> Pt got a flu shot in Oct. 2014 and got diagnosed with GBS (Guillain-Barré syndrome) after it. Pt says it is a rare side affect [sic] to the flu shot and it basically gave him a mini stroke on the right side of his face. Pt started having symptoms that night after the shot."

*Id.*

On April 20, 2015, Petitioner visited Dr. Oster (a neurologist) for possible Botox therapy. Ex. 8 at 16. The record states:

> This is a 32-yo RH man who is referred by Dr. Feras Tanta for the evaluation of Bell's palsy. History is obtained directly from the patient who is an excellent historian.
>
> He reports that in October 2014 he received a routine flu vaccination. About 24 hours later, he developed weakness of the right side of his face that was severe in character.

*Id.* The record under "Impression" further notes, "In this case, this occurred very quickly (within 24 hours) of receiving a flu vaccine." *Id.* at 17.

On July 8, 2016, Petitioner visited Dr. Torres, a neurologist. Ex. 14 at 1. The notes from this visit state, "He relates that in October 2013 or 14 he had a flu shot; within 24 hours he developed right facial weakness…" *Id.*

On February 2, 2017, Petitioner visited Dr. Panida Piboolnurak. Ex. 19 at 2. This "History of Present Illness" section of this record indicates that "[i]n October 2014, within 24 hours after flu shot, [Petitioner] developed right facial weakness (the whole face on the right)…" *Id.*

While other medical records were filed in this case, none were relevant to my determination of onset of Petitioner's signs and symptoms of Bell's Palsy.

**III. The Petition, Affidavits, and Documentary Evidence**

The Petition filed in this matter states that Petitioner developed Bell's Palsy after his flu vaccination on October 28, 2014. Petition at 1.

4

**A. Affidavits**

    **1. Affidavit of Mr. Brent Owens**

In support of his Petition, Mr. Owens signed his first affidavit on July 13, 2016. In this document, he states that he went into Walgreens Pharmacy on October 28, 2014 and received his flu vaccination. Ex. 12 at 2. Two days later (on October 30, 2014), he woke up with numbness of his tongue, along with a swollen, closed right eye and nostril. *Id.* Petitioner went to work. However, by 10:00am, he states that the entire right side of his face felt paralyzed. *Id.* He was unable to close his right eye, and he could not eat, drink, or talk normally. *Id.* Because of this, Petitioner left work and went to see his primary care doctor, Dr. Tanta. *Id.* Dr. Tanta prescribed steroids, gave him an eye patch, and ordered an MRI. *Id.*

Petitioner stated that he started the steroids, but that same night, he felt that it was becoming hard for him to breathe, so he went to the local ER at New Hanover Hospital. Ex. 12 at 3. The doctors diagnosed him with Bell's Palsy. *Id.*

Petitioner continued to follow up with doctors in the weeks that followed his onset of symptoms. Ex. 12 at 3. Petitioner continued to experience slurred speech, facial weakness, and pain and redness in his right eye. *Id.*

Dr. Tanta referred Petitioner to a neurologist in November 2014. Ex. 12 at 3. Petitioner also visited an eye doctor. *Id.* Despite the passage of time and continued use of medication, Petitioner still experienced symptoms due to Bell's Palsy. *Id.* Petitioner visited a different neurologist who suggested that he start Botox injections to reduce the uncontrollable eye movements. *Id.* at 4. According to Petitioner, these injections work for approximately two weeks, and then their effects wear off. *Id.*

As of the date he signed his affidavit, Petitioner still experiences symptoms of Bell's Palsy. Ex. 12 at 4-5. The experience has been life changing for him and has diminished his ability to lead people and to perform his job successfully. *Id.* at 4.

    **2. Supplemental Affidavit of Mr. Brent Owens**

Petitioner signed his supplemental affidavit on April 6, 2018. He states that he was in excellent health before receiving his flu vaccination on October 28, 2014. Ex. 17 at 1. On that date, he went to Walgreens to pick up medicine for his dog. *Id.* He saw a sign for a flu shot and decided to get one. *Id.* He went to bed that night feeling normal, and also felt fine the next day (October 29, 2014). *Id.* at 2.

On October 30, 2014, Petitioner states that he woke up and could not feel the right side of his face. Ex. 17 at 2. When he tried to tell his wife that he could not feel one side of his face, he was unable to speak normally. *Id.* Petitioner then went into the bathroom to see what his face looked like and he saw that the right side of his face was drooping. *Id.* Petitioner was alarmed but thought he could be having a reaction to a bug bite or to something he ate. *Id.* Petitioner decided to go to work. *Id.*

5

When he arrived at work, Petitioner spoke with some of his coworkers. Ex. 17 at 2. Petitioner states that they immediately knew something was "off." Id. His wife Amanda scheduled an appointment with Dr. Tanta for that morning. *Id.* at 2-3. Petitioner's wife met him at the doctor's office. *Id.* at 3.

Petitioner states he told Dr. Tanta that his symptoms started that morning, and that he had received the flu shot two days prior. Ex. 17 at 3. Dr. Tanta diagnosed him with Bell's Palsy and prescribed steroids. *Id.* Petitioner visited the ER that same evening because his symptoms were not improving and he had also developed a headache. *Id.*

Petitioner still experiences symptoms of Bell's Palsy, particularly when he is tired or under stress. Ex. 17 at 4.

### 3. Third Affidavit of Mr. Brent Owens

Petitioner signed his third affidavit on December 5, 2019. Ex. 21. This document was in response to my request that he explain exhibit 6, page 105, a document completed on October 31, 2014, where he wrote that he began experiencing symptoms "three days ago." *See* October 4, 2019 Scheduling Order, ECF No. 46. Petitioner stated that while he recognizes this handwriting on exhibit 6 page 105 as his, he does not have any specific memory of completing this form. Ex. 21 at 2. He further stated that "the flu vaccine, which I received three days before I signed this form, was the trigger of my injury, but not the start of my symptoms." *Id.*

### 4. Affidavit of Ms. Amanda Owens

Amanda Owens, Petitioner's wife, signed her affidavit on April 7, 2018. She stated that in October of 2014, Petitioner came home from work and told her that he got his flu shot at Walgreens Pharmacy. Ex 18 at 1. Two days later, on October 30th in the morning, Ms. Owens was in bed when Petitioner came into their room and said that he could not feel his face. *Id.* When Petitioner spoke, he slurred his words. *Id.* Ms. Owens stated that she was shocked when she looked at her husband because the entire right side of his face was drooping; she thought that he might be having a stroke. *Id.*

Ms. Owens looked on the internet and thought her husband's signs and symptoms were most consistent with either Bell's Palsy or Guillain Barré syndrome (GBS). Ex 18 at 2. She was concerned so she called Dr. Tanta's office and made a same-day appointment for Petitioner. *Id.* Ms. Owens met her husband at the doctor's office. *Id.*

During the visit, Petitioner told Dr. Tanta that his symptoms began that morning, and that he received a flu shot two days before. Ex. 18 at 2. Dr. Tanta diagnosed Petitioner with Bell's Palsy and prescribed medication. *Id.* Later that day, Petitioner's symptoms continued and he also developed a headache, so he went to the local emergency department. *Id.*

Petitioner continued to have symptoms of Bell's Palsy throughout 2014 and for years after. Ex. 18 at 3. Although the right side of Petitioner's face does not appear different to many strangers, she can still notice that it is not back to normal. *Id.*

### 5. Affidavit of Kenneth Young

Kenneth Young is Petitioner's friend who was living with him in October of 2014. Ex. 24 at 1. Mr. Young wrote that Petitioner came home from work early one day and that it seemed that "he was suffering from a stroke because he lost all function on one side of his face." *Id.* Mr. Young drove Petitioner to the hospital that same day. *Id.*

### 6. Affidavit of Jeremy Goins

Jeremy Goins worked with Petitioner in the October 2014 timeframe. Ex. 25 at 1. Mr. Goins described one day in 2014 when Petitioner came into work and stated that his face felt "weird." *Id.* Mr. Goins described that Petitioner's face looked like he may have had a stroke. *Id.* at 1-2. According to Mr. Goins, Petitioner left work immediately and went to the doctor. *Id.* at 2.

### B. Documentary Evidence

Petitioner filed videos that he took depicting the effects he experienced as a result of Bell's Palsy. Ex. 53. He filed an email that Ms. Owens sent to him on October 30, 2014 at 8:44am. Ex. 26. He filed a call log from Amanda Owens' cell phone which included incoming and outgoing phone calls from October 28-30. Ex. 22 at 1.

### C. Testimony at the Hearing

#### 1. Testimony of Petitioner

Petitioner testified that during the time of his flu vaccination, he was working as a site manager at U.S. Tool Group. Tr. at 6. A typical workday for him in that position was from between 7:00 and 8:00am through 5:00 or 6:00pm. *Id.* at 7.

Petitioner worked a different company prior to U.S. Tool Group. Tr. at 6. Before that, he served on active duty with the United States Marine Corps for nine years. *Id.* at 7. He was honorably discharged in 2009. *Id.* at 10. While he was in the Marine Corps, one of his NCO mentors taught him that it was important to visit the doctor if he was not feeling well. *Id.* at 13. Petitioner has tried to follow this advice even after separating from the service. *Id.*

On October 28, 2014, Petitioner got a phone call from his wife telling him they needed dog food. Tr. at 15. Petitioner stopped at a Walgreens Pharmacy located about one block from his house. *Id.* He visited the pharmacy after work sometime between 5:00 and 6:00pm. *Id.* at 16. When he was there, he saw a sign for flu vaccinations. *Id.* at 15. He was not sick at the time and thought it would be a good way to maintain his health. *Id.* Petitioner received his flu vaccination. *Id.* at 16.

When he went to bed that night, he felt normal. Tr. at 18-19. Petitioner also felt normal the entire next day (October 29, 2014). *Id.* at 19.

On October 30, 2014, Petitioner woke up sometime between 6:00 and 6:30am. Tr. at 52. He immediately felt heaviness and numbness on the right side of his face. *Id.* at 21. He went upstairs and told his wife that he didn't feel right. *Id.* He turned on the light in his bedroom and looked in the mirror. *Id.* at 23. Petitioner testified that it looked like he had a stroke. *Id.* The right side of his face was drooping and his eye would not close. *Id.* Amanda was very concerned. *Id.*

Petitioner decided to go to work in the hopes that his symptoms would resolve. Tr. at 24. On his way into the office, Petitioner stopped for coffee. *Id.* at 25. He was unable to drink the coffee without a straw because it would spill out of his mouth. *Id.* When he arrived at his office, his co-workers immediately noticed that something was wrong. *Id.* at 72-73. They encouraged him to go to the ER right away. *Id.* at 30.

Petitioner's wife Amanda made an appointment with her primary care doctor, Dr. Tanta. Tr. at 29. Amanda had been researching Petitioner's symptoms that morning and believed he had developed a reaction as a result of his flu vaccination. *Id.* At the time he arrived at Dr. Tanta's office, he was still experiencing symptoms. *Id.* at 31. Petitioner testified that he sounded drunk, and like he was chewing on rocks. *Id.* at 31-32. He testified that he told Dr. Tanta his symptoms started that morning. Petitioner testified that Dr. Tanta's entry in his medical records that "onset was two days ago and it was acute" was not accurate. *Id.* at 33. Petitioner testified that if he had experienced onset two days prior, he would have gone to the doctor sooner. *Id.* Petitioner decided to go to the ER later that night because his speech was still slurred. *Id.* at 34-35. His friend, Kenneth Young came to the ER with him. *Id.* at 62-63.

Petitioner testified that after his military service he experienced post traumatic stress disorder (PTSD) and traumatic brain injury (TBI). Tr. at 76. Because of these injuries, he has difficulty with his memory. *Id.* For example, he can remember details if there are triggers for these details, but he is not good at remembering names and dates without triggers. *Id.* One example that he gave is that in order to remember how long he has been married, he thinks about all the trips he has taken and adds up the years. *Id.* at 77. Petitioner testified that the extreme symptoms that he experienced on the morning of October 30th stand out in his mind and allow him to remember that date. *Id.* at 77-78.

Although his symptoms from Bell's Palsy have improved, they have never completely gone away. Tr. at 46. Petitioner testified that he still experienced facial heaviness, and difficulty closing one eye. *Id.* To this day, he still drinks with a straw because he does not have normal control over the right side of his face. *Id.* at 47.

### 2. **Testimony of Ms. Amanda Owens**

Ms. Amanda Owens testified that she and Petitioner have been married for five years and have known each other since sixth grade. Tr. at 80.

She testified that Petitioner received his flu vaccination after work on October 28, 2014. Tr. at 85. She did not notice anything unusual that evening or the next day. *Id.* at 85-88.

During the morning of October 30, 2014 Ms. Owens was in bed. Tr. at 88. Petitioner came into their bedroom at around 7:00 or 8:00am and said that he could not feel his face. *Id.* Petitioner turned on the light and Ms. Owens saw that the entire right side of his face was drooping. *Id.* at 89. She also noticed that his speech was muffled and did not sound normal. *Id.* Ms. Owens' first thought was that Petitioner had a stroke. *Id.*

Petitioner decided to go to work because he thought there was a possibility he had been bitten by a bug and was having an allergic reaction that would dissipate. Tr. at 90. After he left for work, Ms. Owens continued to research Petitioner's symptoms on the internet. *Id.* at 90-91. That morning, she sent him an email about some of her internet research. *Id.* at 91.

Ms. Owens scheduled a doctor's appointment for her husband with Dr. Tanta. Tr. at 92. Ms. Owens met Petitioner at Dr. Tanta's office. *Id.* Later that evening, he developed a headache, so Petitioner went to the ER. *Id.* at 94. Ms. Owens did not go with him because she needed to watch their daughter. *Id.*

Petitioner still experiences symptoms of Bell's Palsy. Tr. at 97. Sometimes it is not noticeable, but if he is tired or stressed it becomes more obvious. *Id.*

## IV. Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing ihs claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict

9

with contemporaneous documents is entitled to little evidentiary weight")).  "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate.  *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).  A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination.  *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

## V. Findings of Fact

The issue to be addressed is when Petitioner's symptoms of tongue numbness and facial droop began.  Petitioner has the burden of demonstrating the facts necessary for entitlement to an award by a preponderance of the evidence.  § 300aa-12(a)(1)(A).  Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring).  In light of the witness testimony, medical records, affidavits, and other documentary evidence presented in this case, and after my careful examination of the record as a whole, I find there is preponderant evidence that the onset of Petitioner's tongue numbness began on the morning of October 29, 2014 and the onset of his facial droop began on the morning of October 30, 2014.

### A. Inconsistency in the Medical Records

The medical records in this case are not internally consistent and provide different windows of time regarding the issue of symptom onset. The records discuss onset in time frames that range

from immediate to within 48 hours of flu vaccination. For the reasons discussed in more detail below, I find that the records which place initial onset of symptoms on the morning of October 29th to be the most persuasive in this case.

I find two of the records filed in this case to be especially persuasive: the emergency department record from October 30 and the questionnaire Petitioner completed on October 31.

Petitioner visited the emergency department on October 30, 2014 and was evaluated by Nurse Casey Foster. The medical records from this visit state:

> Patient presents to ED with chief complaint of headache and facial drooping. Patient states that on Tuesday night he received a flu shot. Patient woke up on Wednesday with his tongue numb. Patient woke up this morning with a right facial droop, worsening tongue numbness. Patient was seen by his PCP and was given steroids.

Ex. 6 at 74. This record is persuasive for several reasons. First, it is taken close-in-time to the onset of Petitioner's symptoms. I find that records created at a contemporaneous time with the symptoms they describe are generally more persuasive than records created at a later date. Additionally, it provides a level of detail that does not exist in the other records filed in this case. This record describes a more gradual onset of symptoms, each occurring in a very specific timeframe. It is difficult to imagine a scenario where Nurse Foster mistakenly entered this very precise information involving onset of tongue numbness Wednesday morning followed the next morning by right facial droop and worsening of tongue numbness. This is especially true because information in last two sentences ("Patient woke up this morning with a right facial droop... Patient was seen by his PCP and was given steroids.") are uncontested facts in this matter.

The other record that I find to be especially persuasive is the questionnaire Petitioner completed at the New Hanover Hospital on October 31, 2014. Ex. 6 at 105. In this document, when asked "about how long ago" his symptoms started, Petitioner indicated "3 days." *Id.* Because this document is in his own handwriting, there is no concern that the information Petitioner communicated to the medical providers was somehow misinterpreted or inputted inaccurately. In fact, in his third affidavit, Petitioner agrees that his handwriting appears on this form. Ex. 21 at 2. It would seem that if Petitioner's symptoms had started on October 30, he instead would have indicated that they began yesterday as opposed to writing that they started three days prior. Of note, it is difficult to know whether Petitioner meant that his symptoms began on October 28 or October 29, as "3 days" ago could refer to either date.

Several of the other medical records filed in this case also support onset of symptoms on the morning of October 29. *See* Ex. 8 at 17 (indicating onset occurred "very quickly (within 24 hours) of receiving a flu vaccine"); Ex. 14 at 1 (noting that Petitioner developed right facial weakness within 24 hours of receiving a flu shot); Ex. 19 at 2 (stating that Petitioner developed right facial weakness within 24 hours after flu shot).

There are two medical records which indicate that Petitioner began to experience symptoms of Bell's Palsy 48 hours after his flu shot: the records from Petitioner's visit to the VA

on November 13, 2014 (Ex. 4 at 20), and his visit with Dr. Coin on January 16, 2015 (Ex. 10 at 1). These records specifically indicate a 48-hour onset, as opposed to stating that onset was two days later.[3] In fact, the records from his visit with Dr. Coin state that "on October 28th, [Petitioner] had the flu shot and *almost exactly 48 hours later*, he started having numbness of his tongue on the right and weakness of the face." Ex. 10 at 1 (emphasis added). Petitioner testified that he received his flu vaccination after work on October 28, 2014 sometime between 5:00 and 6:00pm. Petitioner also testified that he woke up at around 6:00am on the morning of October 30, 2014 with dramatic onset of symptoms. This testimony places onset 36 hours after vaccination, and not 48, as noted in the records from Dr. Coin and the VA. The inaccuracy between these two records and Petitioner's testimony at the hearing diminishes their reliability and persuasiveness.

**VI. Conclusion**

I find that the preponderant weight of the medical records filed in this case indicate that Petitioner's onset of tongue numbness began on the morning of October 29, 2014, and the onset of his facial droop began on the morning of October 30, 2014.

The following is therefore ORDERED:

By no later than March 31, 2020, Petitioner shall file a status report indicating how he would like to proceed based on the facts articulated in this ruling.

**IT IS SO ORDERED.**

                                                    **s/ Katherine E. Oler**
                                                    Katherine E. Oler
                                                    Special Master

---

[3] A reference to onset measured in days is inherently less precise than one measured in hours.